IN THE

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

_____

NO.  18-4153

UNITED STATES OF AMERICA,

Appellee,

vs.

KEITH CARVER, JR.,

Appellant.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA, GREENVILLE DIVISION
THE HONORABLE TIMOTHY M. CAIN, PRESIDING

_____

## BRIEF FOR APPELLANT


EMILY DECK HARRILL, ESQUIRE
ASSISTANT FEDERAL PUBLIC DEFENDER
FEDERAL PUBLIC DEFENDER'S OFFICE
1901 ASSEMBLY STREET, SUITE 200
COLUMBIA, SOUTH CAROLINA 29201
TELEPHONE NO.  (803) 765-5079
**ATTORNEY FOR APPELLANT**

# **TABLE OF CONTENTS**

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION . . 1

ISSUE PRESENTED FOR REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE AND FACTS. . . . . . . . . . . . . . . . . . . . . . . . . 3

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ARGUMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    Argument I – Rule 11 Proceeding Defective. . . . . . . . . . . . . . . . . . . . . 17
    Standard of Review – Argument I. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    Argument II – Guideline Calculation Errors. . . . . . . . . . . . . . . . . . . . . 25
    Standard of Review – Argument II. . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
        A. Amount of Loss – USSG § 2B1.1(b)(1). . . . . . . . . . . . . . . . 26
        B.  Number of Victims – USSG § 2B1.1. . . . . . . . . . . . . . . . . 33
        C.  Acceptance of Responsibility – USSG § 3E1.1. . . . . . . . . . . . 36

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

STATEMENT REGARDING ORAL ARGUMENT. . . . . . . . . . . . . . . . . . . 41

CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

ii

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

*Gall v. United States*, 552 U.S. 38 (2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Lee v. United States*, 582 U.S. __, 137 S. Ct 1958 (2017). . . . . . . . . . . . . . . . . 21

*United States v. Cardenas*, 598 F. App'x 264 (5th Cir. 2015). . . . . . . . . . . . . . 32

*United States v. Carter*, 581 F. App'x 206 (4th Cir. 2014). . . . . . . . . . . . . . . . 33

*United States v. Conner*, 537 F.3d 480 (5th Cir. 2008). . . . . . . . . . . . . . . . . . . 34

*United States v. Davila*, 569 U.S. 597 (2013).. . . . . . . . . . . . . . . . . . . . . . . . 17, 24

*United States v. DeFusco*, 949 F.2d 114 (4th Cir. 1991). . . . . . . . . . . . . . . . . . 17

*United States v. Douglas*, 885 F.3d 124 (3d Cir. 2018). . . . . . . . . . . . . . . . . . . 35

*United States v. Goins*, 51 F.3d 400 (4th Cir. 1995).. . . . . . . . . . . . . . . . . . . 20, 21

*United States v. Gomez-Jimenez*, 750 F.3d 370. . . . . . . . . . . . . . . . . . . . . . . 39, 40

*United States v. Hargrove*, 478 F.3d 196 (4th Cir. 2007). . . . . . . . . . . . . . . 23, *38*

*United States v. Horton*, 693 F.3d 463 (4th Cir. 2012).. . . . . . . . . . . . . . . . . . . 25

*United States v. Jeffrey*, 631 F.3d 669 (4th Cir. 2011). . . . . . . . . . . . . . . . . . . . 36

*United States v. Jones*, 557 F. Supp. 2d 630 (E.D. Pa. 2008).. . . . . . . . . . . . . . 31

*United States v. Kennedy*, 554 F.3d 415 (3d Cir. 2009). . . . . . . . . . . . . . . . . . . 35

*United States v. Massam*, 751 F.3d 1229 (11th Cir. 2014).. . . . . . . . . . . . . . . . 36

*United States v. Miller*, 316 F.3d 495 (4th Cir. 2003). . . . . . . . . . . . . . . . . . . . 26

*United States v. Moon*, 808 F.3d 1085 (6th Cir. 2015). . . . . . . . . . . . . . . . . . . . . 32

*United States v. Nale*, 101 F.3d 1000 (4th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Onyesoh*, 674 F.3d 1157 (9th Cir. 2012). . . . . . . . . . . . 30, 31, 33

*United States v. Orr*, 567 F.3d 610 (10th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Otuya*, 720 F.3d 183 (4th Cir. 2013). . . . . . . . . . . . . . . . . . . . . 36

*United States v. Popovski*, 872 F.3d 552 (7th Cir. 2017). . . . . . . . . . . . . . . . 32, 33

*United States v. Sanya*, 774 F.3d 812 (4th Cir. 2014). . . . . . . . . . . . . . . . . . . . . 17

*United States v. Stepanian*, 570 F.3d 51 (1st Cir. 2009). . . . . . . . . . . . . . . . . . . 35

*United States v. Strieper*, 666 F.3d 288 (4th Cir. 2012). . . . . . . . . . . . . . . . . . . . 17

*United States v. Stubblefield*, 682 F.3d 502 (6th Cir. 2012) . . . . . . . . . . . . . . . . 35

*United States v. Thomas*, 841 F.3d 760 (8th Cir. 2016). . . . . . . . . . . . . . . . . . . . 31

*United States v. Watch*, 7 F.3d 422 (5th Cir. 1993). . . . . . . . . . . . . . . . . . . . 21, 22

*United States v. Yagar*, 404 F.3d 967 (6th Cir. 2005). . . . . . . . . . . . . . . . . . . . . 35

## **STATUTES**

18 U.S.C. § 3553(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 25, 39

18 U.S.C. § 3742. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

18 U.S.C. § 1028A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

18 U.S.C. § 1028A(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 4, 23

18 U.S.C. § 1028A(b)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

18 U.S.C. § 1029(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

18 U.S.C. § 1029(a)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

18 U.S.C.  § 1029(e)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 30, 32

18 U.S.C.  § 1029(e)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

18 U.S.C.  § 1029(e)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## **RULES**

Federal Rule of Criminal Procedure 7. . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Federal Rule of Criminal Procedure 7(b). . . . . . . . . . . . . . . . . . . . . . . . . 18

Federal Rule of Criminal Procedure 11. . . . . . . . . . . . . . . . . . . . . . . . 16, 17

Federal Rule of Criminal Procedure 11(b)(1). . . . . . . . . . . . . . . . . . . . . . 17

Federal Rule of Criminal Procedure 11(b)(1)(A). . . . . . . . . . . . . . . . . . . . 24

Federal Rule of Criminal Procedure 11(b)(1)(B). . . . . . . . . . . . . . . . . . . . 18

Federal Rule of Criminal Procedure 11(b)(1)(D). . . . . . . . . . . . . . . . . . . . 24

Federal Rule of Criminal Procedure 11(b)(1)(E). . . . . . . . . . . . . . . . . . . . 18

Federal Rule of Criminal Procedure 11(b)(1)(H). . . . . . . . . . . . . . . . . . . . 19

Federal Rule of Criminal Procedure 11(b)(1)(I)..........................19

Federal Rule of Criminal Procedure 11(b)(1)(J)..........................24

Federal Rule of Criminal Procedure 11(b)(1)(K)..........................24

Federal Rule of Criminal Procedure 11(b)(1)(M)..........................24

Federal Rule of Criminal Procedure 11(b)(2)..........................18, 24

Federal Rule of Criminal Procedure 11(b)(3)..........................18

## **GUIDELINES**

§ 2B1.1...........................33

§ 2B1.1(b)(1)...........................26

§ 2B1.1(b)(1)(C)...........................7

§ 2B1.1(b)(2)(A)(i)...........................7

§ 2B1.1 cmt. n.1...........................16, 33, 35, 36

§ 2B1.1 cmt. n.3(A)...........................26

§ 2B1.1 cmt. n.3(A)(i)...........................26, 32, 34, 36

§ 2B1.1 cmt. n.3(A)(ii)...........................26

§ 2B1.1 cmt. n.3(A)(iii)...........................34

§ 2B1.1 cmt. n.3(F)(i)...........................7, 26, 31, 32

§ 2B1.6 cmt. n.2...........................34, 35

§ 3D1.1(b)(1)...........................23

§ 3D1.1 intro. cmt.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

§ 3D1.2(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

§ 3E1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16, 23, 36

§ 3E1.1(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## <u>STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION</u>

Keith Carver, Jr. (Mr. Carver) appeals from the Judgment in a Criminal Case entered February 23, 2018, in the District of South Carolina.  Joint Appendix ("JA") 172-177.  Mr. Carver timely filed his Notice of Appeal on March 9, 2018.  JA 178. Jurisdiction of this Court is authorized by 28 U.S.C. § 1291 and 18 U.S.C. § 3742. The District Court had jurisdiction under 18 U.S.C. §§ 1029(a)(3), 1029(a)(4), 1028A(a)(1), and 2.

## ISSUE PRESENTED FOR REVIEW

Whether the United States magistrate judge violated several provisions of Rule 11 of the Rules of Criminal Procedure during the guilty plea proceeding held February 16, 2017, such that Mr. Carver's substantial rights were affected and his guilty plea to the Information is infirm.

Whether the district court committed procedural error at sentencing in overruling Mr. Carver's objections to the sentencing enhancement for the number of victims (United States Sentencing Guideline ("USSG") § 2B1.1(b)(2)(A)(i)) and the amount of loss (USSG § 2B1.1(b)(1)(C)), and in denying acceptance of responsibility under USSG § 3E1.1.

## STATEMENT OF THE CASE AND FACTS

On April 13, 2016, Keith Wayne Carver, Jr. (Mr. Carver) was indicted in the District of South Carolina, Greenville Division, for possession of at least fifteen access devices with intent to defraud and aid and abet, in violation of 18 U.S.C. §§ 1029(a)(3) and 2 (Count 1); possession of device making equipment with intent to defraud and aid and abet, in violation of 18 U.S.C. §§ 1029(a)(4) and 2 (Count 2), and aggravated identity theft and aid and abet, in violation of 18 U.S.C. § 1028A and 2. JA 10-13.

On November 30, 2016, Mr. Carver appeared with counsel and pleaded guilty to Counts 1 and 2 of the Indictment without entering into a plea agreement with the government. *See* JA 14-56. Mr. Carver reserved his right to go to trial on Count 3 of the indictment. *See* JA 15, 24. When reviewing the impact of the sentencing guidelines and "acceptance of responsibility" (as that term is applied in the sentencing guidelines), the district court told Mr. Carver that pleading guilty to Counts 1 and 2 of the indictment and going to trial on Count 3 might impact his eligibility for acceptance of responsibility. JA 37-40. Defense counsel affirmed that he and Mr. Carver had discussed that it might impact his case. JA 38. Government counsel asserted that if Mr. Carver went to trial on Count 3 and were found guilty, "the Government would object to any acceptance of responsibility being – him being

3

given credit for that because that would be inconsistent with a jury's verdict." JA 39. The district court noted that in the event Mr. Carver was convicted on Count 3, "the Government will makes its argument and [defense counsel] will make [his] argument, and it would be up to the Court to make a decision." JA 40. The district court also inquired of the probation officer who was present if he needed to add anything to what had been discussed in this regard; the probation officer indicated no further information needed to be conveyed. JA 40.

Mr. Carver's trial on Count 3 was set for jury selection on January 24, 2017, with the trial to proceed in late February 2017. See JA 6, ECF No. 105 (jury selection date of January 24, 2017; jury trial set for February 22 through 24, 2017). On January 20, 2017, Mr. Carver signed a written waiver of his right to trial by jury and consented to a bench trial before the district court. JA 57.

On February 15, 2017, Mr. Carver executed a "Notice of Intent to Enter a Plea of Guilty" to an Information alleging aggravated identity theft, a violation of 18 U.S.C. § 1028A(a)(1). JA 58. On February 16, 2017, the government filed a felony Information, charging Mr. Carver with aggravated identity theft arising from the felony access device fraud charge in Count 1 of the indictment, in violation of 18 U.S.C. § 1028A(a)(1). JA 59. The Information identified a different victim than was identified in Count 3 of the original Indictment. Mr. Carver executed a Waiver of

4

Indictment form on February 16, 2017.  JA 60.  Mr. Carver also executed a Consent

to Proceed with Entry of Plea before a United States Magistrate Judge form that same

date.  JA 61.

On February 16, 2017, Mr. Carver appeared with counsel before a United

States magistrate judge.  Government counsel indicated Mr. Carver intended to plead

guilty to the Information, and that he waived presentment to a grand jury.  JA 63.

Defense counsel acknowledged that Mr. Carver had executed documents waiving

presentment and to proceed before the magistrate judge for entry of a guilty plea.  JA

63.  The magistrate judge did not inquire of Mr. Carver if he agreed with counsel's

representations.

Mr. Carver was placed under oath.  The magistrate judge asked Mr. Carver his

age and educational background, JA 64; whether he was under the influence of any

drugs or medications that would keep him from understanding questions put to him,

JA 64; confirmed he had been afforded the opportunity to "review [his] case with"

defense counsel, JA 65; and determined he was satisfied with counsel's

representation, JA 65.  Government counsel read the Information in open court, stated

the elements of the offense, and noted the "maximum possible punishment is . . . two

years consecutive to any other term of imprisonment imposed for the fraud count,"

as well as a fine, supervised release, and a special assessment fee.  JA 66.

The magistrate judge indicated that "I need to make sure that you understand that you do have a right to go to trial on these charges[,]" JA 69, and that "by giving up that right to trial, you're giving up your right to be presumed innocent. . . . You're also giving up the right to cross-examine any witnesses the Government would have to put up to prove all the elements against you. . . . And if I accept your guilty plea, you understand that you have waived your right to have a trial?" JA 70. The magistrate judge also noted that "you've also waived your right not to incriminate yourself. Do you understand that as well?" JA 70. Mr. Chandler affirmatively acknowledged that he understood the questions and these trial rights he would be relinquishing. The magistrate judge inquired, "Has anyone promised you anything in exchange for your guilty plea today?" JA 70. Mr. Carver indicated that he had been made no promises.

The magistrate judge concluded:

In light [of] your representations to me, since you acknowledge that you are, in fact, guilty as charged in the information, you know your right to a trial, what the maximum possible punishment would be, and since you voluntarily, intelligently and knowingly [are] pleading guilty, I'll accept your guilty plea today to this information [ ] and enter a judgment of guilty on your behalf on this information. Is there anything additional we need to cover today . . . .?

JA 70-71. The parties indicated there was nothing else to be covered, and he proceeding concluded.

6

In preparation for sentencing, a Presentence Report (PSR) was prepared. JA 181-206 (Sealed). The probation officer added a four-level enhancement under USSG § 2B1.1(b)(1)(C) for a loss amount greater than $15,000 but less than $40,000, indicating that the number of "cards" found during the search was "51 cards that were re-encoded and two full financial transaction cards written [sic] . . . ." JA 188 ¶ 13. The probation officer multiplied this number (53) by $500, pursuant to USSG § 2B1.1, comment. n.3(F)(i), producing an intended loss figure of $26,500. JA 188 ¶ 13 (Sealed). Taken together with two other figures ($540 "held on [redacted] card at the hotel, plus $1,342.02 "that was charged to [redacted]," *id.*), "for a total intended loss of $28,382.02." *Id*. The probation officer also added a two-level enhancement for "27 victims," JA 188, ¶ 14 (Sealed); JA 198 ¶ 59, pursuant to USSG § 2B1.1(b)(2)(A)(i). JA 198, ¶¶ 58, 59. The identities of these victims were not specified.

Through counsel, Mr. Carver presented objections to the PSR. Mr. Carver objected to the loss amount, arguing only twenty-six (26) of the cards should be considered, as the "remainder of the cards were unusable due to incomplete coding or error, gift cards, issued to the defendants." JA 181 (Sealed). Counsel also argued that the evidence did not support the enhancement of more than ten (10) victims. JA 181 (Sealed). The probation officer indicated that "[t]he information provided in

paragraphs 13 [the loss amount] and 14 [the number of victims] was provided by the case agent to the probation officer. The calculations will remain as laid out in the presentence report." JA 181 (Sealed). The government did not file objections to the PSR. The probation officer declined the amend the PSR based on Mr. Carver's objections and the matter was set for sentencing.

On February 21, 2018, Mr. Carver appeared with counsel for sentencing. In support of the enhancements, the government called Detective Michael Dean (Dean) of the Greenville Police Department, who had investigated the case. Dean testified that on June 1, 2015, he investigated a suspected fraudulent credit card transaction at a Greenville-area hotel. When he arrived at the hotel, Dean encountered Mr. Carver, who provided him the credit card which had been used to secure a room at the hotel in question. Dean determined the numbers on the front of the card did not match the numbers encoded onto the magnetic strip on the back of the card. JA 87. Mr. Carver and his co-defendant in this case, Haidee Sharp Gillespie, were thereafter arrested. A search warrant for Mr. Carver's hotel room was obtained. During a search of the room, authorities discovered, *inter alia*, a variety of materials which appeared to relate to financial and identity theft crimes, including "64 different cards . . . ." JA 89.

Eventually, Dean ended up checking these cards by running each one through

8

a "card reader," which read the cards to determine whether any information had been encoded onto the magnetic strips on the back of the cards. JA 90. Dean testified that "[s]ome of" the cards were "re-encoded[,]" JA 90; that is, the numbers that were embossed on the front of the cards did not match numbers encoded onto the magnetic strips on the back of the cards. JA 90.

Dean indicated fifty-one (51) cards had been "encoded." JA 91. Dean also testified that various types of identification documents of fifteen (15) different individuals were located in the room during the search. JA 91.

Many of the recovered cards were Visa gift cards. JA 98. Dean checked all of the cards and "the numbers that were on the magnetic strips were different on some of them compared to what was on the face of the cards." JA 99. Of the sixty-four (64) cards Dean tested, two (2) cards were validly issued to either Mr. Carver or Ms. Gillespie, his co-defendant in this case, JA 90; one (1) was a hotel room key, JA 103; two (2) were not financial transaction cards, JA 103; three (3) cards were found with no information on them or were not readable, JA 104; and nine (9) were "financial transaction cards found not to be altered." JA 104. Forty-four (44) of the cards had "numbers written on the back of them," JA 104, which in Dean's experience indicated the numbers on the front of the card did not match the numbers encoded onto the magnetic strip on the back of the card. JA 104-105.

9

Dean had no information that either Mr. Carver or his co-defendant came into possession of the gift cards illegally. JA 107. Dean did not know whether the letter "E" at the end of a line of numbers produced by the card reader (and re-printed in a chart reviewed in court by the parties and the district court) meant an "error" code that would make the card unusable. JA 108. However, for at least some cards, an "E" produced by a card reader "usually means there is either nothing on the strip or there is a problem with the code." JA 108.

Although the PSR stated there were twenty-seven (27) victims in this case, and the government had, at the beginning of the sentencing hearing, provided defense counsel with a list of "about" twenty-seven names, *see* JA 180 (Sealed), Dean testified that he found "identification documents" or other identifying information for fifteen (15) victims associated with this case. JA 91.[1]

The district court asked Dean questions about how individuals perpetrate financial fraud at certain stores, and then questioned Dean about Mr. Carver's objections regarding amount of loss, as "Mr. Carver is saying only 26 of the cards should be considered because the remainder were unusable due to incomplete coding or error [or were] gift cards issued to the Defendants." JA 118. Dean again indicated

---

[1]It appears that the list of twenty-seven names was produced by adding together the names of victims from this case and a 2014 state court case which Dean also investigated.

10

that fifty-one (51) cards "had been encoded," JA 118. The district court also inquired about the number of victims. JA 119. Dean indicated that the number of victims in this case was the fifteen (15) individuals who had been identified earlier in the hearing, JA 119, and an unspecified "three others that weren't added to" that number. JA 119. The total number of "victims" in Mr. Carver's case was, therefore, said to be eighteen (18). JA 120.

Mr. Carver did not testify. Government counsel stated that instead of the fifty-three (53) cards stated in the PSR, the correct number should be fifty-one (51), and that eighteen (18) victims were associated with Mr. Carver's case instead of the twenty-seven (27) noted in the PSR. JA 120.

Defense counsel argued that as to calculation of loss, the cards needed to be able to "complete the process," JA 121, and that the objection turned on how one defines "unauthorized access device." JA 122. As to the number of victims, defense counsel argued it was "a question of whether you want to accept that testimony as people who they identify with this particular incident from 2015." JA 122.

The district court granted in part Mr. Carver's objection as to the number of unauthorized access devices, finding that the correct number to be fifty-one (51) instead of fifty-three (53). JA 126. The district court overruled Mr. Carver's objection regarding the number of victims, finding that the government had proven

11

the "number of victims is more than ten." JA 127. The district court then indicated that it had reviewed the plea transcript of Mr. Carver's guilty plea to Counts 1 and 2, and that when government counsel presented facts to form the basis of the plea at that hearing, government counsel had stated that there were "over 50 gift cards and credit cards in various names scattered throughout the room . . . ." JA 128 (quoting plea hearing transcript). The district court indicated it was considering denying Mr. Carver acceptance of responsibility, which had been applied to the calculation of the guideline under USSG § 3E1.1 "based on the objections that were made and especially in light of the transcript of the plea hearing." JA 132. The district court then reviewed the guideline calculations in light of its ruling on Mr. Carver's objections, finding that the calculations resulted in an offense level 12, criminal history category IV. JA 132. With acceptance of responsibility, this produced a guideline range of 21 to 27 months' imprisonment, JA 132, with a two year consecutive sentence of imprisonment for his conviction for aggravated identity theft. JA 132.

The district court then heard argument from the parties on the issue of acceptance of responsibility, stating, "I am not trying to be punitive, but we could have probably tried this case in about as much time [as] it took to deal with these

12

objections[,][2] [a]nd I think we had either drawn a jury or had jury selection
scheduled." JA 134. Government counsel agreed , emphasizing "that was one reason
why the Magistrate [Judge] stepped in to accept the guilty plea is because we were
very close to the jury selection." JA 134. Government counsel also argued that Mr.
Carver's objections to the PSR, "particularly the ones on the number of cards where
he disputes that there were only 26, that the rest of them should not be counted, the
Government would submit that that is inconsistent with acceptance of responsibility
and that the Court can consider that." JA 134. Government counsel then presented
argument regarding sentencing factors under 18 U.S.C. § 3553(a), and asked for a
sentence "at the high end of the range[.]" JA 136.

Defense counsel noted that when Mr. Carver agreed there were over fifty (50)
gift cards and credit cards found in the hotel room search, that

> doesn't necessarily mean that he was agreeing that those cards were
> unauthorized access devices and they contributed to any kind of a loss
> amount. There is nothing in the plea presentation that indicates that
> there were [a] certain number of victims or there was a projected loss
> amount in any particular number . . . .

JA 137. Defense counsel presented additional argument in mitigation, *see* JA 139-

---

[2]The hearing had commenced at 11:48 a.m. JA 76. The district court took a
lunch break at approximately 1:05 p.m., JA 125, directing the parties to come back
at "five after two," JA 126, and adjourned at 3:13 p.m. There is no information in the
transcript regarding the time the district court reconvened after the lunch break.

142, and then the district court asked Mr. Carver if he wished to address the court.

Mr. Carver apologized, noting that he was "well aware" that he had caused financial

harm to others, and that while there was not an excuse for his actions, he was fighting

an addiction to pain medication prescribed after a carjacking in 2000, and that he had

made specific arrangements to "stop the cycle" of being in and out of jail because of

his addiction.  JA 144.  Mr. Carver's mother had been diagnosed with terminal

cancer, and had less than six months to live.  Mr. Carver lamented that he wanted to

"let her know that I am okay and I will be okay and I am the son that she raised."  JA

145.

The district court ruled Mr. Carver had not established that he had accepted

responsibility for his offense.  JA 146.  The district court quoted from the application

note to this guideline, and found that

> in this instance, the Defendant has contested some of these issues when
> it was essentially not warranted. . . . [M]y sense is that Mr. Carver really
> is not remorseful for what he has done.  I don't find his testimony that
> he is sorry for what he has done to be credible.  I have been doing this
> a long time and I am not fussing about it, but his actions throughout this
> case and in particular at sentencing do not comport with the actions of
> someone who is truly remorseful and wants to turn his life around.

JA 148-149.  The district court then recalculated the guidelines, placing Mr. Carver

at an offense level 14, criminal history category IV, producing a range of

imprisonment for Counts 1 and 2 of 27 to 33 months.  JA 149.  The district court then

14

reviewed the statutory sentencing factors, including Mr. Carver's criminal history, the nature and circumstances of the offense, his personal background, and a variety of factors associated with the offense of conviction. JA 149-152. The district court sentenced Mr. Carver to 33 months' imprisonment as to Counts 1 and 2, with the terms to be served concurrently with each other, and 24 months' imprisonment as to the Information, to be served consecutively to the sentence on Counts 1 and 2, as required by statute. JA 153. The district court also imposed three years' supervised release and a $300 special assessment fee. JA 153.

The district court indicated that it believed it had properly calculated the guidelines but that "if it is later determined that I have not, I would have imposed this same sentence as an alternate variant sentence in light of all of the 18 USC Section 3553(a) factors and in light of the totality of the circumstances present in this case . . . ." JA 154-155.

The Judgment Order containing Mr. Carver's sentence was filed on February 23, 2018. JA 172-177. Mr. Carver timely filed a notice of appeal on March 9, 2018. JA 178.

## SUMMARY OF THE ARGUMENTS

The United States magistrate judge violated Rule 7 and several provisions of Rule 11 of the Rules of Criminal Procedure during the guilty plea proceeding held February 16, 2017, such that Mr. Carver's substantial rights were affected and his guilty plea to Count 3 is infirm.

The district court committed procedural error at sentencing in overruling Mr. Carver's objections. First, the district court erred in denying in part the objection to the amount of loss calculation. An "unauthorized access device" should be "usable." The government provided no evidence of usability of any of the cards. Mr. Carver's objection should have been sustained.

Second, "victim," as defined at USSG § 2B1.1 cmt. n.1, has a much narrower definition than was applied by the district court. As a result, the number of victims associated with Mr. Carver's offense was at most two (2), not eighteen (18), and Mr. Carver's objection to this enhancement should have been sustained.

Mr. Carver neither falsely denied nor frivolously contested the enhancements. The district court clearly erred in denying Mr. Carver a two-level reduction for acceptance of responsibility under USSG § 3E1.1. This error was not harmless, as Mr. Carver has been imprisoned for a term longer than he otherwise would have been.

## ARGUMENT I – Rule 11 Proceeding Defective

### Standard of Review

Because Mr. Carver neither objected to the Rule 11 errors at the time of his guilty plea hearing nor attempted to withdraw his plea, this Court reviews the Rule 11 proceeding under the plain error standard of review. *United States v. Sanya*, 774 F.3d 812, 815 (4th Cir. 2014). To establish plain error, an appellant must demonstrate "that an error (1) was made, (2) is plain (*i.e.*, clear or obvious), and (3) affects substantial rights." *United States v. Strieper*, 666 F.3d 288, 295 (4th Cir. 2012) (citation, alteration, and internal quotation marks omitted). To establish that his substantial rights were affected in the context of a guilty plea, a defendant "must show a reasonable probability that, but for the error, he would not have entered the plea." *United States v. Davila*, 569 U.S. 597, 608 (2013).

Before accepting a guilty plea, the presiding judge[3] must conduct a plea colloquy in which it informs a defendant of, and determines he understands, the rights he is relinquishing by pleading guilty, the charges to which he is pleading, and the maximum and mandatory minimum penalties he faces. Fed. R. Crim. P. 11(b)(1); *United States v. DeFusco*, 949 F.2d 114, 116 (4th Cir. 1991). The court must also

---

[3]In Mr. Carver's case, he consented to have a magistrate judge take his guilty plea. This plea proceeding was later specifically affirmed by the district court at sentencing. JA 124.

ensure a defendant's plea is voluntary and not the result of threats, force, or promises not revealed in either a plea agreement or orally in open court, Fed. R. Crim. P. 11(b)(2), and "that there is a factual basis for the plea," Fed. R. Crim. P. 11(b)(3).

The magistrate judge failed to comply with several crucial aspects of Rule 11. Initially, the magistrate judge failed to confirm with Mr. Carver in open court that he wished to waive his right to be indicted on the charges to which he was pleading guilty. *See* Fed. R. Crim. P. 7(b) ("An offense which may be punished by imprisonment for a term exceeding one year . . . may be prosecuted by information if the defendant, after he has been advised of the nature of the charge and of his rights, waives in open court prosecution by indictment."). While it can be argued that entry of a guilty plea to an Information implicitly waives the right to proceed by indictment, this position presumes a valid guilty plea. As argued below, Mr. Carver's guilty plea to the Information is infirm, which in turn is informed by this failure.

Rule 11(b)(1)(B) provides that the court must inform the defendant of "the right to plead not guilty . . . ." The magistrate judge failed to inform Mr. Carver that he had a right to persist in a plea of not guilty to the Information, even if he had consented to being charged via Information versus indictment.

Rule 11(b)(1)(E) provides that a defendant shall be advised of certain trial rights, including "the right at trial to confront and cross-examine adverse witnesses,

18

to be protected from compelled self-incrimination, to testify and present evidence, and to compel the attendance of witnesses." The magistrate judge did not advise Mr. Carver that he had a right to testify and present evidence, or that he had a right to compel the attendance of witnesses on his behalf.

Rule 11(b)(1)(H) and (I) provide that a defendant must be informed of the maximum possible penalty associated with the offense, and any mandatory minimum penalty. The magistrate judge relied on government counsel to present the elements of the offense and the penalty. Government counsel misstated the penalties associated with a conviction on the Information. Government counsel indicated that the maximum possible penalty "is a fine of $250,000, imprisonment for two years consecutive *to any other term of imprisonment imposed for the fraud count*, and supervised release of one year, with a special assessment fee of $100." JA 66 (emphasis added). The magistrate judge asked Mr. Carver whether he "also [understood] to maximum penalties you would be facing on this charge," whereupon Mr. Carver interrupted and said, "Two years." JA 69.

Title 18 U.S.C. § 1028A(b)(2) provides that the two year period of imprisonment shall be served consecutively "with any other term of imprisonment imposed on the person under any other provision of law, including the term of imprisonment for the felony during which the means of identification was transferred,

19

possessed, or used." Mr. Carver had previously pleaded guilty to both Counts 1 and 2 of the original indictment. Therefore, he was not informed that any sentence imposed Information would be served consecutively to any sentence imposed on Counts 1 *and* 2 of the Indictment. There is no evidence in the record that Mr. Carver was aware of this important aspect of the penalty he faced.

In *United States v. Goins*, 51 F.3d 400 (4th Cir. 1995), this Court found the district court erred when it did not inform the defendant that he faced a mandatory minimum sentence in a drug case. *Goins*, 51 F.3d at 405. The Court distinguished between cases where defendants have knowledge of the applicable mandatory minimum sentence despite the court's failure to recount it during the Rule 11 colloquy and cases where the defendant has no knowledge of the mandatory minimum at the time of the plea. *See id.* at 403. In *Goins*, the mandatory minimum sentence was not mentioned at the plea proceeding nor in the indictment or plea agreement. *Id.* at 404. The only oral reference to the mandatory minimum was at the sentencing hearing when the government stated, "[T]he guideline range is 60 months because that's the statutory minimum, and we would ask that he be sentenced to 60 months in jail." *Id.* The only written reference to the mandatory minimum sentence was in the presentence report prepared nearly three months after the court accepted Goins's guilty plea. *Id.* at 402. Moreover, even after Goins's counsel received the

20

presentence report which mentioned the mandatory minimum sentence, defendant requested a sentence "within the guideline range of 33 to 41 months." *Id.* The government responded by stating that "the guideline range is 60 months because that's the statutory minimum." *Id.* This Court determined that "there is no evidence in the record that [defendant] was aware that he was subjecting himself to a mandatory five year sentence by pleading guilty." *Id.*

Mr. Carver was incorrectly advised regarding penalty associated with a conviction of 18 U.S.C. § 1028A. There is no evidence in the record that Mr. Carver was aware that he was facing a mandatory minimum sentence of two years' imprisonment which was to be served consecutively to *any* other count of conviction versus just his Conviction on Count 1 of the Indictment. There was no written plea agreement in this case. The Information itself only noted the relevant statutory section; no penalty was recited thereon. When the magistrate judge inquired of Mr. Carver whether he understood "the maximum penalties" he would be facing, he simply responded, "[t]wo years." JA 69. There is no "affirmative indication in the record," *Goins*, 51 F.3d at 403, that Mr. Carver was aware of the direct consequences of pleading guilty to this offense. *See Lee v. United States*, 582 U.S. __, 137 S. Ct. 1958, 1965 (2017) (error was one that "affected Lee's understanding of the consequences of pleading guilty"). *See also United States v. Watch*, 7 F.3d 422, 429

21

(5th Cir. 1993) (failure to tell defendant of statutory mandatory minimum "misled [the defendant] as to the statutory minimum term of imprisonment to which he subjected himself by pleading guilty.").

Compounding this error, Mr. Carver had been left with the impression at his guilty plea on Counts 1 and 2 that pleading guilty on those charges and proceeding to trial on Count 3 of the Indictment "might or might not affect your entitlement to acceptance of responsibility under the Sentencing Guidelines." JA 37. Defense counsel indicated that this was "an area, frankly, I have never faced so I would have to look at it and prior to beginning this guilty plea hearing, I spoke with Mr. Carver about that just to put him on notice that it might be different." JA 38. Government counsel then stated that if Mr. Carver were found guilty of Count 3, "the Government would object to any acceptance of responsibility being – him being given credit for that because that would be inconsistent with a jury's verdict. . . . [I]t would be the Government's position that he would not be entitled to any kind of acceptance of responsibility." JA 39. The district court noted it would be "up to the Court to make a decision." JA 40.

The Introductory Commentary to USSG § 3D1.1 provides that "counts that are grouped together are treated as constituting a single offense for purposes of the guidelines." USSG § 3D1.1 intro. cmt. "As a result, under the terms of U.S.S.G. §

22

3E1.1, the defendant must only accept responsibility for the grouped guidelines counts in order to be *eligible* for the reduction in offense level for that particular 'offense.'" *United States v. Hargrove*, 478 F.3d 196, 200 (4th Cir. 2007) (emphasis in original).  It was apparent that either no one at the November guilty plea knew or no one considered that Counts 1 and 2 would be grouped together under USSG § 3D1.2(d), and that Mr. Carver did *not* risk losing eligibility for acceptance of responsibility by proceeding to trial on Count 3 of the Indictment (or, as is relevant here, an Information) charging a violation of 18 U.S.C. § 1028A(a)(1).  *See* JA 198 ¶ 56 (Sealed) (noting grouping rules and exclusion of the Information pursuant to USSG § 3D1.1(b)(1)).  The district court told Mr. Carver it "might or might not affect your entitlement to acceptance of responsibility under the Guidelines."  Defense counsel indicated he had not dealt with the issue before; government counsel argued Mr. Carver should not be "given credit" for acceptance of responsibility if he went to trial and was found guilty by a jury because "that would be inconsistent with a jury's verdict." JA 39.  Even the probation officer sat mute.  Therefore, Mr. Carver was left with the impression that if he pursued a trial on a charge of violation of 18 U.S.C. § 1028A, he risked losing any possibility of a benefit of acceptance of responsibility under USSG § 3E1.1.  This was not correct.

As to the question of whether he would not have pleaded guilty to the

Information, prior to pleading guilty to the § 1028A offense, Mr. Carver preserved his right to go to trial on Count 3 of the Indictment. Indeed, jury selection for trial on that count had been set, and a trial date was scheduled. Mr. Carver even went so far as to agree to waive his right to a jury trial and proceed before the district court on a bench trial. JA 57. The Information was the same offense to which he entered a guilty plea, merely a different victim.[4]

Taken together, the Rule 11 omissions and colloquy noted above which occurred at his guilty plea to Counts 1 and 2 affected Mr. Carver's substantial rights.[5] *See Davila*, 569 U.S. at 608 (stating that, to demonstrate effect on substantial rights in Rule 11 context, defendant "must show a reasonable probability that, but for the error, he would not have entered the plea" (internal quotation marks omitted)). Mr.

_____

[4]The Indictment noted that the victim of the aggravated identity theft offense was an individual with the initials "C.R." JA 11. This individual was among the list of people approved at sentencing of having been victimized by Mr. Carver's actions. JA 180 (Sealed).

[5]The magistrate judge also failed to advise Mr. Carver of the potential consequences of any false statement made under oath (Fed. R. Crim. P. 11(b)(1)(A)); the right to be represented by counsel at every critical stage of the proceeding (Fed. R. Crim. P. 11(b)(1)(D)); the possibility of forfeiture and restitution (Fed. R. Crim. P. 11(b)(1)(J), (K)); and the court's obligation to consider sentencing guidelines, calculate the correct range, and "other sentencing factors under 18 U.S.C. § 3553(a)." (Fed. R. Crim. P. 11(b)(1)(M)). Additionally, the magistrate judge asked Mr. Carver if any promises had been made to him, but did not inquire as to any force or threats. Fed. R. Crim. P. 11(b)(2).

Carver has established a reasonable probability that he would have proceeded to trial on this charge. Mr. Carver's guilty plea on the Information is infirm, and his conviction and sentence on the Information should be vacated.

## ARGUMENT II – Guideline Calculation Errors

### Standard of Review

This Court reviews a sentence "whether inside, just outside, or significantly outside the Guidelines range[,] under a deferential abuse-of-discretion standard." *Gall v. United States*, 552 U.S. 38, 41 (2007). This review requires consideration of both the procedural and substantive reasonableness of the sentence. *Id.* at 51. In determining procedural reasonableness, this Court considers whether the district court properly calculated the advisory Sentencing Guidelines range, gave the parties an opportunity to argue for an appropriate sentence, considered the 18 U.S.C. § 3553(a) factors, selected a sentence based on facts that were not clearly erroneous, and explained sufficiently the selected sentence. *Id.* at 49-51.

When assessing a district court's calculation of the Guidelines range, including any enhancements, this Court reviews a district court's legal conclusions *de novo* and its factual findings for clear error. *See United States v. Horton*, 693 F.3d 463, 474 (4th Cir. 2012).

### A.  Amount of Loss – USSG § 2B1.1(b)(1)

When calculating the Guidelines range applicable to a fraud offense, the government is required to establish the amount of loss by a preponderance of the evidence. *See United States v. Miller*, 316 F.3d 495, 503 (4th Cir. 2003). "[L]oss is the greater of actual loss or intended loss." USSG § 2B1.1 cmt. n.3(A). "Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense[,]" *id.* at n.3(A)(i); "intended loss" is defined as "pecuniary harm that the defendant purposely sought to inflict[,]" and includes intended harm that would have been "impossible or unlikely to occur." *Id*. at n.3(A)(ii). For cases like Mr. Carver's involving counterfeit or unauthorized access devices, "loss includes any unauthorized charges made with the counterfeit access device or unauthorized access device and shall be no less than $500 per access device." USSG § 2B1.1 cmt. n.3(F)(i).

The term "access device" is defined by statute, in relevant part, to include "any card, plate, code, account number, electronic serial number, . . . or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value . . . ." 18 U.S.C. § 1029(e)(1). The term "counterfeit access device" means "any access device that is counterfeit, fictitious, altered, or forged, or an identifiable component of an access device or a counterfeit access device." 18 U.S.C. § 1029(e)(2). "Unauthorized access device" means "any access device that is lost, stolen, expired, revoked, canceled, or

26

obtained with intent to defraud[.]" 18 U.S.C. § 1029(e)(3).

The district court adopted the government's assertion that of the sixty-four (64) cards tested by Dean, fifty-one (51) of those cards had been "encoded." Yet by Dean's own testimony and the information in the PSR, it appears only forty-five (45) of the cards tested should have been counted as perhaps qualifying as counterfeit or unauthorized access devices and multiplied by $500. That is, of the sixty-four (64) tested, one (1) was a hotel key, two (2) were "not financial transaction cards," JA 103, nine (9) were "financial transaction cards found not be altered," JA 104, three (3) were found with "no information on them or they would not read," JA 104, and two (2) of the cards were issued to Mr. Carver or his co-defendant, JA 90. This total is forty-seven (47) cards, not fifty-one (51). Additionally, two of the cards were listed as having identifiable loss: one belonging to "Ms. [redacted]," (loss identified as $1,342.02), and one belonging to "Mr. [redacted]," (loss identified as $540 held "on [the] card at the hotel"). JA 188, ¶ 13 (Sealed). Therefore, these two cards should not have been included in any number multiplied by the $500 minimum, as this would be double-counting these cards in loss calculation. Accordingly, assuming these 45 cards could be found to be unauthorized or counterfeit access devices, the amount of loss attributable to Mr. Carver should have been only $24,382.02.

Dean testified that "some" of the cards found and tested were "encoded," JA

27

90, and some had been "re-encoded[,]" *id.*; that is, that "the numbers that were on the magnetic strips were different *on some* of them compared to what was on the face of the cards." JA 99 (emphasis added). Government counsel specifically asked Dean, "How many of those cards did you find had been *encoded*?" JA 90-91 (emphasis added). Dean's response was fifty-one (51) cards. JA 91. *See also* JA 99 ("I checked all of the cards and the numbers that were on the magnetic strips were different *on some of them* compared to what was on the face of the card.") (emphasis added).

On re-direct, government counsel inquired, "[H]ow many financial cards, access devices did you run that had been *encoded* in this case?" JA 109 (emphasis added). Dean again indicated fifty-one (51) cards had been "encoded." Government counsel also inquired whether, "The numbers that were encoded on the back of the gift card [sic], did they match the ones that were on the front?" JA 109-110. Dean indicated that they did not. *Id.* Government counsel asked, "So they were unauthorized at that point . . . [b]ecause they had different numbers encoded than was reflected on the front?" JA 110. Dean agreed that was "what [he] found on those 51 cards[.]" *Id.*

This testimony fails to establish by a preponderance of the evidence the true number of unauthorized or counterfeit access devices that should be included in the loss amount calculation in this case. The testimony varies from "some" cards having

been "encoded," to fifty-one (51) cards having been "encoded," to "some" cards having been "re-encoded." "Encoded" could mean legitimately encoded, like the one card that was "actually issued" to Mr. Carver. JA 90. Moreover, "some" is a term associated with both "encoded" and "re-encoded."

Additionally, Dean indicated that for some cards, having an "E" appear in the code read off the magnetic strip "usually means there is either nothing on the strip or there is a problem with the code." JA 108. Yet there is no testimony regarding how many cards produced this "E" code, particularly including those cards where an "E" appeared at the end of the code, as Dean did not know what that meant. *See* JA 108.

Forty-four (44) cards were found with handwritten numbers on the back of the cards. Dean believed this meant that if "a card that ends in 1234, if that number was put on the magnetic strip but the face of the gift card is 0001, having the number 1234 on the back of the card will help me remember what actual card number that I'm using . . . ." JA 104. This testimony further confuses the ultimate question. Does this mean only forty-four (44) of the cards were re-encoded with numbers that were different than what was on the front of the card? Did any of these cards produce an "E" code? It is unclear from the testimony.

There also is no evidence that any of the cards were "usable." As noted above, the statute defines "access device" as meaning a card "that *can be used*, alone or in

conjunction with another access device, to obtain money, goods, services, or other things of value . . . ." 18 U.S.C. § 1029(e)(1) (emphasis added). And the statute defines "counterfeit" access device and "unauthorized" access device both by reference to the definition of "access device." Usability, therefore, should not be read out of the statute. *See United States v. Onyesoh*, 674 F.3d 1157, 1159 (9th Cir. 2012). Indeed, in calculating the loss amount attributable to Mr. Carver, the district court necessarily relied on usability, as it accepted the number of cards attributable to Mr. Carver to be fifty-one (51), not sixty-four (64). As noted above, of the cards tested, one (1) was a hotel key, two (2) were not financial transaction cards, and two (2) cards belonged to Mr. Carver and his co-defendant. That leaves fifty-nine (59) access devices, not fifty-one (51). Therefore, to find fifty-one (51) cards attributable to Mr. Carver, the district court necessarily had to assess usability and then subtract that number to reach the number it found attributable to Mr. Carver.

The government offered Dean as a witness to establish that a certain number of cards were found and had been "encoded" or "re-encoded." Dean offered no testimony about how many of the cards were usable. "The government does not need to prove that each access device found was successfully used to perpetrate a fraud but only that each *could have been used* to do so." *United States v. Jones*, 557 F. Supp. 2d 630, 638 (E.D. Pa. 2008) (emphasis added) "[U]nauthorized access devices are

a subset of access devices and therefore must be capable of obtaining something of value." *Onyesoh*, 674 F.3d at 1159. That is, while the kind of devices covered is laid out in the statute, "the statute say nothing about the quantum of proof necessary to establish usability." *Id*.

When calculating loss, the Commentary specifically notes:

**Stolen or Counterfeit Credit Cards and Access Devices; Purloined Numbers and Codes**.--In a case involving any counterfeit access device or unauthorized access device, loss includes any unauthorized charges made with the counterfeit access device or unauthorized access device and shall be not less than $500 per access device. However, if the unauthorized access device is a means of telecommunications access that identifies a specific telecommunications instrument or telecommunications account (including an electronic serial number/mobile identification number (ESN/MIN) pair), and that means was only possessed, and not used, during the commission of the offense, loss shall be not less than $100 per unused means. For purposes of this subdivision, "counterfeit access device" and "unauthorized access device" have the meaning given those terms in Application Note 10(A).

USSG § 2B1.1 cmt. n.3(F)(i). Courts have pointed to this language to reject defendants' arguments that a counterfeit or unauthorized access device must have been used in order to be counted in the loss amount. *See United States v. Thomas*, 841 F.3d 760, 764 (8th Cir. 2016) (noting "the authors of the Guidelines knew how to limit the application of these provisions to the use of access devices.") (quoting *United States v. Cardenas*, 598 F. App'x 264, 267 (5th Cir. 2015); *United States v. Moon*, 808 F.3d 1085, 1090-92 (6th Cir. 2015) (collecting cases). However, this

31

same language also supports a "usability" requirement. That is, "loss includes any unauthorized charges made with the counterfeit access device or unauthorized access device and shall be not less than $500 per *access device*." USSG § 2B1.1 cmt. n.3(F)(i) (emphasis added). The commentary states that the minimum is "$500 per access device," not $500 per "counterfeit access device" or $500 per "unauthorized access device." The specific reference to "access device" requires "any card, plate, code, account number, electronic serial number, . . . or other means of account access *that can be used*, alone or in conjunction with another access device, *to obtain* money, goods, services, or any other thing of value . . . ." 18 U.S.C. § 1029(e)(1) (emphases added).

The Sixth Circuit has disagreed with this position relating to "usability." In *Moon*, 808 F.3d at 1090-92, the Sixth Circuit held the guidelines define "intended loss" to include "pecuniary harm that would have been impossible or unlikely to occur." (quoting USSG § 2B1.1 cmt. n.3(A)(i)). The court found that "[a] 'usability' requirement would arguably conflict with this expansive definition of 'intended loss' and the fact that pecuniary harm might even be impossible but still countable as 'intended loss.'" *Id*. 808 F.3d at 1092. *See also United States v. Popovski*, 872 F.3d 552 (7th Cir. 2017) (rejecting *Onyesoh* "usability" requirement).

This Court has not expressly addressed this issue in a published opinion.

32

However, in *United States v. Carter*, 581 F. App'x 206 (4th Cir. 2014) (*per curiam*), the Court noted that Carter argued for adoption of the *Onyesoh* "usability" standard, but that the government had "validated more than 800 credit card numbers used in the scheme," and Carter "produced no evidence or argument that any of the valid numbers were not useable." 581 F. App'x at 208.

In Mr. Carver's case, the government did not produce *any* information that *any* of the numbers "encoded" or "re-encoded" onto the cards were useable, and Mr. Carver, through counsel, argued there were at least some of the numbers (although it is unclear at this point how many) produced an "Error" code and would not have been useable.

Therefore, the district court clearly erred in calculating the intended loss amount in this matter.

### B.  Number of Victims – USSG § 2B1.1

Application Note 1 of USSG § 2B1.1 defines "victim" as "any person who sustained any part of the actual loss determined under subsection (b)(1)." USSG § 2B1.1 cmt. n.1. "Actual loss," in turn, is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id*. cmt. n. 3(A)(i). Application Note 3(A)(i) explains that "'pecuniary harm' means harm that is monetary or that otherwise is readily measurable in money," and "does not include emotional distress, harm to

33

reputation, or other non-economic harm." *Id.* at cmt. n. 3(A)(iii).

The district court applied an overly broad definition of "victim" in this case. In the PSR, there were only two (2) victims identified who may have suffered any "actual loss." *See* JA 188 ¶ 13 (Sealed). Instead, the government sought to include as victims individuals whose identification documents cards or tax documents were found during the search of the hotel room. *See* JA 89, 91. The government argued this number was fifteen (15) and "three others that weren't added to it[,]" JA 119, for a total of eighteen (18) victims.

Calculating loss and identifying victims are "distinct concept[s]" under § 2B1.1. *United States v. Conner*, 537 F.3d 480, 491 n.38 (5th Cir. 2008). And this is not a case relating to the possession of "means of identification," as that is covered by Mr. Carver's conviction of aggravated identify theft. The Guidelines specifically provide that:

> If a sentence under this guideline is imposed in conjunction with a sentence for an underlying offense, do not apply any specific offense characteristic for the transfer, possession, or use of a means of identification when determining the sentence for the underlying offense. A sentence under this guideline accounts for this factor for the underlying offense of conviction, including any such enhancement that would apply based on conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct).

USSG § 2B1.6 cmt. n.2. Therefore, to the extent the district court applied the

34

enhancement based on Mr. Carver having been found in the possession of identification documents, the district court clearly erred.

Even if any of the eighteen (18) individuals found by the district court could be preliminarily found to be "victims," there also is a question whether any person identified was a victim at all. There is a divide in authority among the Circuit Courts regarding who can be counted as a "victim" in these cases. In *United States v. Yagar*, the Sixth Circuit held that bank account holders do not count as "'victims' under the Guidelines [where] they [a]re fully reimbursed for their temporary financial losses." 404 F.3d 967, 971 (6th Cir. 2005); *see also*, *e.g.*, *United States v. Stubblefield*, 682 F.3d 502 (6th Cir. 2012); *United States v. Orr*, 567 F.3d 610 (10th Cir. 2009); *United States v. Kennedy*, 554 F.3d 415, 419 (3d Cir. 2009), abrogated on other grounds by *United States v. Douglas*, 885 F.3d 124 (3d Cir. 2018). On the other hand, the First Circuit "reject[ed]" the position taken in *Yagar* and in other circuits, that "account holders d[o] not suffer actual pecuniary harm, 'readily measurable in money,' [if] their losses were reimbursed." *United States v. Stepanian*, 570 F.3d 51, 56 (1st Cir. 2009). The First Circuit posits that the definition of "victim" in USSG § 2B1.1 cmt. n.1 "does not have a temporal limit or otherwise indicate that losses must be permanent." *Id.* at 55. This Court has "yet to squarely address this issue." *United States v. Otuya*, 720 F.3d 183, 192 (4th Cir. 2013). But as noted by the Eleventh

Circuit,

> "Victim" is defined as "any person who sustained any part of the *actual loss* determined under subsection (b)(1)." [USSG] § 2B1.1 cmt. n.1 (emphasis added). And "actual loss" is defined as "the reasonably foreseeable pecuniary *harm that resulted from* the offense." *Id.* § 2B1.1 cmt. n.3(A)(i) (emphasis added). Putting those points together, a credit against loss requires a "victim," which requires an actual loss, which does not exist when there is only intended loss.

*United States v. Massam*, 751 F.3d 1229, 1233 (11th Cir. 2014). Absent information that the individuals identified in the PSR actually suffered a loss which was not reimbursed or forgiven by a bank or credit card company, there were no victims in this case.

For these reasons, the district court clearly erred in applying this enhancement.

### C.  Acceptance of Responsibility – USSG § 3E1.1

Section 3E1.1 of the U.S. Sentencing Guidelines Manual provides for a two-level reduction for a defendant who "'clearly demonstrates acceptance of responsibility for his offense.' " *United States v. Jeffery*, 631 F.3d 669, 678 (4th Cir. 2011) (quoting USSG § 3E1.1(a)). To merit this reduction, the defendant must establish by a preponderance of the evidence "that he has clearly recognized and affirmatively accepted personal responsibility for his criminal conduct." *United States v. Nale*, 101 F.3d 1000, 1005 (4th Cir. 1996).

The district court based its decision to deny acceptance of responsibility "on

36

the objections that were made and especially in light of the transcript of the plea hearing." JA 132. The district court found that Mr. Carver "contested some of these issues when it was essentially not warranted." JA 148. Yet as demonstrated above, Mr. Carver neither falsely denied nor frivolously contested relevant conduct associated with his offenses of conviction. The district court did not find Mr. Carver had delayed in pleading guilty to any of the counts of conviction. Moreover, the issues raised by Mr. Carver are substantive legal issues on which there are at least debatable questions to be addressed. And as noted by defense counsel, when Mr. Carver assented to the government's recitation of facts at his guilty plea hearing—that there were over fifty cards found during the search—that did not necessarily mean he was agreeing that those cards "were unauthorized access devices and they contributed to any kind of a loss amount. There is nothing in the plea presentation that indicates that there were [a] certain number of victims or there was a projected loss amount in any particular number . . . ." JA 137.

The district court qualified its decision by indicating that it was "not trying to be punitive, but we could have probably tried this case in about as much time [as] it took to deal with these objections[,] [a]nd I think we had either drawn a jury or had jury selection scheduled." JA 134. The government agreed with the district court, indicating "that was one reason why the Magistrate [Judge] stepped in to accept the

37

guilty plea is because we were very close to the jury selection." JA 134. Yet both of

these assertions are not supported by the record. First, Mr. Carver had *waived* his

right to a jury trial prior to the jury selection date. *See* JA 57. So as of January 20,

2017, there *was no* jury selection scheduled. *See* JA 6, ECF No. 107 (cancellation of

Jan. 24, 2017, jury selection).

Second, the district court had set aside three days to try Mr. Carver's case. *See*

JA 6, ECF No. 108 (setting bench trial dates of February 22 through February 24,

2017). While the district court spent several hours addressing Mr. Carver's

objections, it did not spend the three days it had originally scheduled.

A guilty plea does not automatically entitle a defendant to a reduction for

acceptance of responsibility, and the district court evaluates a defendant's acts and

statements to determine whether the defendant has accepted responsibility. *See*

*Hargrove*, 478 F.3d at 201-02. Here, the district court found that "his actions

throughout this case and in particular at sentencing do not comport with the actions

of someone who is truly remorseful and wants to turn his life around." JA 149. Yet

Mr. Carver's "actions at sentencing" were merely pursuing objections which he was

entitled to make, as it is the government's burden to prove enhancements based upon

a preponderance of the evidence. Mr. Carver did not testify regarding the objections

addressed at sentencing. When Mr. Carver did address the district court, he did not

38

contest relevant conduct or indicate in any manner that he was not responsible for his crime. *See* JA 143-145. Based on the district court's remarks, it can only be assumed that the district court believed Mr. Carver's objections to the PSR were frivolous, and that this warranted a denial of acceptance of responsibility. This is simply not the case.

The district court tried to cover its rulings by indicating that it would have imposed the same sentence "as an alternate variant sentence in light of all of the 18 U.S.C. Section 3553(a) factors and in light of the totality of the circumstances present in this case[.]" JA 154-155. Even if the district court had found the loss amount was greater than $15,000, the resulting guideline calculation, including acceptance of responsibility, was 15 to 21 months' imprisonment as to Counts 1 and 2.[6] The sentence imposed, 33 months' imprisonment, is twice as high as the bottom end of that range. There is nothing in the district court's recitation of its reasons for the imposition of an alternate variant sentence that "can help [this Court] identify when an erroneous Guidelines calculation had no effect on the final sentencing determination." *United States v. Gomez-Jimenez*, 750 F.3d 370, 391 (4th Cir. 2014),

---

[6]This is based on a base offense level 6, a four-level enhancement for loss, and a two-level enhancement for possession of device-making equipment, resulting in an offense level 12. Subtracting two levels for acceptance of responsibility, the offense level would be 10. With a criminal history IV, this produces an imprisonment range of 15 to 21 months.

as corrected (Apr. 29, 2014) (Gregory, J., dissenting).

## **CONCLUSION**

For all the reasons articulated above, the district court's errors in calculating the guideline range were not harmless, and despite its statement to the contrary, the district court's denial of acceptance of responsibility to Mr. Carver was a punitive action based on his having challenged the enhancements in his case. This was clear error. The errors in this case necessitate vacating Mr. Carver's conviction on the Information, and vacating Mr. Carver's sentence.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Pursuant to Appellate Rule 34(a), Mr. Carver does not believe oral argument

is necessary in this case.


Respectfully submitted,

*s/Emily Deck Harrill*
Emily Deck Harrill
Assistant Federal Public Defender
Office of the Federal Public Defender
District of South Carolina
1901 Assembly Street
Suite 200
Columbia, South Carolina 29201
803.765.5079

**Attorney for Appellant Keith Wayne Carver, Jr.**
**No. 18-4153**

Columbia, South Carolina
June 8, 2018

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**
**Effective 12/01/2016**

No. _____    Caption: _____

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

---

**Type-Volume Limit for Briefs:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines.    Appellee's Opening/Response Brief  may not exceed 15,300 words or 1,500 lines.  A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type.  <u>See</u> Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

---

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words.  Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

---

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger.  A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

---

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ ]    this brief or other document contains _____ [*state number of*] words

[ ]    this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[ ]    this brief or other document has been prepared in a proportionally spaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*]; **or**

[ ]    this brief or other document has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s)_____

Party Name_____

Dated:_____

42

## CERTIFICATE OF SERVICE

I, EMILY DECK HARRILL, Assistant Federal Public Defender, certify that I have this date **electronically filed** the **BRIEF FOR APPELLANT** with the Fourth Circuit Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF user(s):

1.   **Ms. E. Jeanne Howard, Esq.**
     **Assistant United States Attorney**
     **55 Beattie Place**
     **Suite 700**
     **Greenville, South Carolina 29601**

I further certify that I have mailed the **BRIEF FOR APPELLANT** by First-Class Mail, postage-prepaid, to the following non-CM/ECF participant(s), addressed as follows:

**LEGAL MAIL**
**DO NOT OPEN EXCEPT IN PRESENCE OF ADDRESSEE**

2.   **Keith Wayne Carver, Jr., #31268-171**
     **FMC Lexington**
     **Federal Medical Center**
     **P.O. Box 14500**
     **Lexington, KY 40512**

                    s/EMILY DECK HARRILL
                    Assistant Federal Public Defender
                    Federal Public Defender's Office
                    1901 Assembly Street, Suite 200
                    Columbia, SC  29201
                    Telephone: (803) 765-5079
                    **ATTORNEY FOR APPELLANT**
                    **KEITH CARVER, JR.**
                    **APPEAL NUMBER: 18-4153**

Columbia, South Carolina
June 8, 2018

43